**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

Nedrick Jeffrey Hardy, Sr. (B-50437),    )
                                          )
          Plaintiff,           )
                                          )     Case No. 12 C 6033
v.                                   )
                                          )     Judge Thomas M. Durkin
                                          )
Salvador Godinez, et al.,          )
                   Defendant.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Nedrick Hardy, an inmate currently confined at Menard Correctional Center, filed this 42 U.S.C. § 1983 civil rights suit about adverse living conditions at Stateville Correctional Center ("Stateville"), where he was incarcerated from 2000 to 2014. Defendants, former Stateville Warden Marcus Hardy, former Stateville Engineer Jon Luschinger, Illinois Department of Corrections ("IDOC") Director John Baldwin, former IDOC Acting Director Gladyse Taylor, and former Stateville Counselor Colleen Franklin ("Defendants"),[1] have filed a motion for summary judgment. Plaintiff has responded. For the reasons stated herein, the Court grants Defendants' motion for two claims: Plaintiff's claim that Stateville's water supply was contaminated with radium or similar pollutants, and his request for injunctive relief. Plaintiff may proceed with his other claims, including his claim that the water from the sink in his cell was undrinkable.

### I.  Summary Judgment Standard of Review

#### A.  Federal Rule of Civil Procedure 56:

Pursuant to Federal Rule of Civil Procedure 56(a), this Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To establish that

---

[1] Other parties listed as Defendants in Plaintiff's complaint were dismissed in the Court's 5/9/13 order.  (Dkt. #19.)

a material fact is undisputed, a party "must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Rule 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Rule 56(c)(3). Courts must "construe all facts and draw all reasonable inferences in favor of the nonmoving party." *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the allegations of his complaint and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). A genuine issue of material fact exists only if there is evidence "to permit a jury to return a verdict for" the nonmoving party. *Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845, 849 (7th Cir. 2010); *Carroll*, 698 F.3d at 564 ("[m]ere metaphysical doubt" about material facts is not enough).

**B.      Northern District of Illinois Local Rule 56.1:**

When addressing a motion for summary judgment, the Court derives the background facts from the parties' N.D. Ill. Local Rule 56.1 Statements and Responses, which assist the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Under Local Rule 56.1(a)(3), the moving party must provide "a statement of material facts as to which the moving party contends there is no genuine

issue." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). The statement must "consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Local Rule 56.1(a).

The non-moving party must admit or deny each factual statement offered by the moving party and refer to any material facts that establish a genuine dispute for trial. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). The non-moving party may submit his own statements of facts, to which the moving party must similarly reply. Local Rule 56.1(b)(3)(C) & (a)(3). This Court may consider true a Rule 56.1 factual statement that is supported by the record and that is not properly addressed by the opposing party. Local Rule 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."). The same rule applies for facts submitted by a non-moving party that are not contested or responded to by the moving party. Local Rule 56.1(a)(3)(C); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). A party's *pro se* status does not excuse him from complying with these rules. *Greer v. Bd. of Edu. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001); *see also McNeil v. United States*, 508 U.S. 106, 113 (1993).

In this case, Defendants filed a Rule 56.1 Statement of Material Facts ("SOF"). (Dkt. 119 and 129.) With their Statement, they include the following materials: Plaintiff's complaint; his depositions (he was deposed twice); former Stateville Warden Hardy's declaration; documents addressing the quality of Stateville's water; sign-in sheets for Critter Ritter (Stateville's exterminator); cellhouse repair records; and excerpts from a class action suit before another judge of this Court (*Dobbey v. Weilding*, No. 13 C 1068 (N.D. Ill.) (Dow, J.)). (*See* Dkts. 119 and 129) (the Court directed Defendants to refile their exhibits since several exhibits—though included with their physical, courtesy

copy provided to the Court and Plaintiff—were missing from their electronically-filed SOF.) Each of Defendants' Rule 56.1 factual statements cites to parts of the record. (Dkt. 119.) Defendants also submitted a copy of the Local Rule 56.2 Notice to Pro Se Litigants sent to Plaintiff, which sets out how Plaintiff was to respond to Defendants' summary judgment motion and Rule 56.1 Statement. (Dkt. 120.)

Plaintiff did not submit a memorandum of law; however, his responses to Defendants' Rule 56.1 Statement include not only citations to the record but also citations to cases. (Dkt. 125.) Though the Court's local rule requires litigants to file a memorandum in support of their response to a motion for summary judgment, *see* Local Rule 56.1(b)(2), our rule does not clearly indicate that a litigant cannot combine his memorandum of law with his responses to a movant's Rule 56.1 Statement. *See generally* Local Rule 56.1(b). The Court thus does not consider Plaintiff's approach contrary to Court's local rules.[1] With the above stated review standards in mind, the Court turns to the facts of this case.

## II. Facts:

Plaintiff is an Illinois inmate currently confined at Menard Correctional Center. (Dkt. 119, ¶ 1; Dkt. 125, ¶ 1.) He was convicted in 2000 and was sentenced to 55 years' imprisonment. (*Id.* at ¶ 10.)[2] He was confined at Stateville from 2000 to 2014, when he was transferred to Menard. (*Id.* at ¶¶ 1, 12.)

Defendant Salvador Godinez was Director of Illinois Department of Corrections ("IDOC") from May 2, 2011 to December 31, 2014. (*Id.* at ¶ 2.) Gladyse Taylor was the

---

[1] Defendants' Reply notes the absence of a separate memorandum of law in Plaintiff's response and states that Plaintiff has not responded to Defendants' arguments. (Dkt. 126.) Where Plaintiff's responses to Defendants' Rule 56.1 statements include no discussion of law, the Court will consider that Plaintiff has not responded to Defendants' arguments. But where Plaintiff includes a legal argument and citations to cases in his response to a Rule 56.1 statement, the Court may consider Plaintiff's legal arguments as responsive to Defendants' arguments.

[2] Where the prior citation refers to both Defendants' Rule 56.1 Statement and Plaintiff's response, the Court's use of "*id.*" refers to both pleadings.

acting IDOC Director from September 30, 2010 to May 2, 2011. (*Id.* at ¶ 7.) Marcus Hardy is currently IDOC Deputy Chief of Operations. Previously, he was the warden of Stateville from December 1, 2009 to December 31, 2012. (*Id.* at ¶ 3.) Jerry Baldwin was a Stateville Correctional Counselor. He is now the Director of the IDOC. (*Id.* at ¶ 4.) Jon Luschinger was an engineer at Stateville (possibly the head engineer). (*Id.* ¶ 5.) Colleen Franklin was a Correctional Counselor at Stateville. (*Id.* ¶ 6.)

Plaintiff's amended complaint (the complaint that controls this case) alleges he was exposed to the following adverse conditions at Stateville: the prison's overall water supply was contaminated; water in his cell was undrinkable; pest infestations; inadequate air ventilation; excessive mold; dirty cells with inadequate access to cleaning supplies; broken windows; lead paint; and overcrowding. (*Id.* at ¶ 13.)

**Drinkable Water:**

According to Plaintiff, the water that came from the sink in his cell[3] was brown, "smelled like sewerage (feces)," and sometimes "smelled like bleach." (Dkt. 124, Pl. Decl. at ¶ 3.) Plaintiff drank this water on several occasions because there was no other water available. (*Id.* at ¶ 4.) He states he became ill after drinking it (he threw up, had diarrhea, and experienced stomach cramps). (*Id* at ¶¶ 4, 5, 8.)

Plaintiff acknowledges he received milk and juice with breakfast, but he cannot drink juice because of acid reflux. (Dkt. 119 at ¶ 14; Dkt. 125 at ¶ 14.) In F House (segregation), Plaintiff received all three meals in his cell. (Dkt. 129-2, Pl. Depo. at 33-34.) Though breakfast included milk and juice to drink, "[a]t lunch and dinner, you don't get nothing." (*Id.* at 27.) In general population, he received breakfast in his cell. The other two meals were in the chow hall. (*Id.* at 33-34.)

---

[3] Plaintiff was housed in two cell houses—D House (general population) and F House (segregation). The grievances Plaintiff wrote that complained about brown, foul smelling water appear to be from when he was in cell D340. (Dkt. 125, Exhs. E and K.) However, the parties do not state, and the record does not indicate, if the brown water condition was in only one or multiple cells.

Plaintiff acknowledges that inmates could purchase water, soda, Kool-Aid, coffee, and tea at the commissary, but he contends that it is the State's obligation to provide inmates with water to drink and to wash. (*Id.* at ¶ 16.) Also, though the record does not indicate if Plaintiff had sufficient funds to purchase water, prior to his incarceration, he was indigent and receiving Social Security benefits. (*Id.*)

Plaintiff wrote a grievance in November of 2010, part of which complained about brown, foul smelling water coming from his sink. (Dkt. 125 at ¶ 13.) His grievance stated that, on several occasions, the water made him vomit, made him constipated, and made his stomach feel like it was "balled in a knot like I been punched." (Dkt. 125, Exh. K, pg. 28.) Baldwin (then a Stateville correctional counselor) responded that he spoke to Chief Engineer Luschinger who stated that Stateville's water was connected to the municipality's water system, which was tested monthly to ensure it passed Environmental Protection Agency ("EPA") guidelines. (*Id.* at pg. 27.) Baldwin further stated: "Also, once again, the grievant is not mandated to drink the water provided if he feels such is not safe." (*Id.* at pg. 28.) Grievance Officer Franklin, after noting Plaintiff's complaint and Baldwin's response, found that Baldwin's response was acceptable. (*Id.* at pg. 29.) Plaintiff acknowledges he never spoke to IDOC Acting Director Taylor, but he states he sent her letters informing her about his situation. (Dkts. 119 and 125 at ¶ 24.)

Although Plaintiff suffered both diarrhea and constipation at Stateville, he acknowledges he does not know the cause. (Dkt. 119 at ¶ 19; Dkt. 125 at ¶ 19.) No medical personnel informed Plaintiff that his symptoms were caused by Stateville's drinking water. (Dkt. 119 at ¶ 20.) No one at Stateville ever informed Plaintiff that the water was unfit to drink. (*Id.* at ¶ 21.) However, a Warden's Bulletin was circulated in 2003 advising Stateville residents and staff that the amount of radium had exceeded the maximum allowable amount set by the Illinois Pollution Control Board. (Dkt. 125, Exh.

I.)  The bulletin stated that options to address the issue were being investigated and that monitoring of radium levels was being performed quarterly.  (*Id.*)

Warden Hardy is unaware of any staff member or inmate being diagnosed with a condition related to potentially contaminated water.  (*Id.* at ¶ 35.)  Hardy states he drank Stateville's water every day while he served as warden with no adverse results.  (*id.*)

Stateville is located in Crest Hill, Will County.  (Dkt. 119 at ¶ 25.)  The City of Crest Hill supplies water to Stateville.  (*Id.* at ¶ 34.)  Stateville did not have its own well water between 2009 and 2012.  (*Id.*) The prison's water was tested monthly during that time.  All tests results for contaminants were within normal, acceptable ranges.  (*Id.*) Plaintiff does not contest whether the water was tested regularly, but he contends that brown water that smells like sewerage cannot be safe.  (Dkt. 125 at ¶ 34.)  There is no indication in the record that the water specifically from Plaintiff's cell was tested.

**Pest Infestations:**

The State of Illinois has a contract with the pest control company Critter Ridder. (Dkt. 119 at ¶ 27.)  Warden Hardy's declaration[4] states that exterminators visited Stateville several times a month to spray common areas.  (*Id.*)  At some point while he was warden, Hardy directed that individual cells also be sprayed once a month to address increased complaints of roaches.  (*Id.* at ¶ 28) (his declaration does not state when this practice started).  According to Warden Hardy: inmates were removed from their cells; cells were sprayed; and inmates were then returned to their cells.  (*Id.*)  He states that the roach infestation problem improved after implementing this practice.  (*Id.* at ¶ 29.)

---

[4] Warden Hardy's declaration initially submitted by Defendants is unsigned.  After Plaintiff noted the absence of a signature, counsel for Defendants submitted a signed version with his reply and explained that, due to time constraints, he was unable to obtain a signature before filing the summary judgment motion. (Dkt. 128.)  Defendants' counsel states that Warden Hardy prepared and reviewed the declaration.  (*Id.*) Though Defendants' attorney should have supplemented the record with a signed version of the declaration shortly after filing the motion for summary judgment (as opposed to waiting until Plaintiff caught the omission), the Court accepts Defendants' explanation and considers the declaration signed.

According to Warden Hardy's declaration, when he received complaints about bird excrement, he directed power washing of affected areas and the placing of screens on outside doors. (*Id.* at ¶ 30.) If he received a complaint about rodents or other pests, he asked staff to follow up and have the exterminator pay special attention to those areas. (*Id.* at ¶ 31.) Staff would request additional glue strips from exterminators to address increased complaints of mice. (*Id.*)

Included with Defendants' summary judgment materials are Critter Ridder's sign-in sheets at Stateville from July 2010 to June of 2012. (Dkt. 129-5, Exh. E.) According to these sheets, a Critter Ridder exterminator visited the cell houses, (including D and F Houses) at least once a month. (*Id.*) Only two entries (12/16/10 and 10/20/11), however, indicate the exterminator visited "F Unit, all cells." (*Id.* at 14, 33.)

Plaintiff does not contest that Stateville had a contract with an exterminator that regularly sprayed. (Dkt. 125 at ¶¶ 27-30.) But he does contend that the pest infestation problem was not resolved and existed for years. (*Id.* at ¶ 29.) More specifically, he states: (1) Warden Hardy's declaration is not signed and therefore should not be considered, (2) a 2011 John Howard Association "Monitoring Report of Stateville Correctional Center" states that there were numerous inmate complaints of pests and that the "prior vendor was found to have been using expired, watered-down pesticides," and (3) IDOC Safety and Sanitation Reports from 2009-2012 indicated that D and F Houses were not free of insects, rodents, or birds and that outer openings often were not protected. (*Id.* at ¶¶ 27-28, quoting Exh. D and citing Exh. Q.)

Plaintiff's declaration states that he had roaches and mice in his cell and that they got into his property box. (Dkt. 124 at ¶ 14.) According to Plaintiff, he complained about the problem both verbally and in written grievances, but he did not see an exterminator after making such complaints. (*Id.*) Plaintiff states that birds flew around

his cellhouse "like they were outside." (*Id.* at ¶ 15.) There was "bird poop on the walls, the exhaust fan, [and the] blower." (*Id.*)

Plaintiff's April 15, 2011, grievance complained about a number of adverse conditions, including pests. (Dkt. 125, Exh. R, pgs. 52-54.) Plaintiff complained he saw a mouse the night before, birds fly around the cell house, there is bird feces throughout the cell house, birds defecated on heating pipes which "is so hot" inmates are breathing in the feces. (*Id.* at pgs. 52-53.) The response Plaintiff received explained that "[e]very effort is being made to ensure wildlife do not enter the living units; however, from time to time this does occur due to open doors and windows in the unit." (*Id.* at pg. 54.) Plaintiff was advised to keep food items covered and stored to avoid unnecessary infestations. (*Id.*)

**Ventilation:**

Warden Hardy states in his declaration that cell houses at Stateville have large exhaust and/or pedestal fans, and are heated by steam heat with an air handler for ventilation. (Dkt. 119 at ¶ 26.) The air handlers have filters that are regularly replaced. (*Id.*) Each cell has a return air vent, which many inmates cover. (*Id.*) These vents are regularly cleaned and their filters are regularly replaced. (*Id.*) If repairs are needed, work orders are issued and carried out by staff. (*Id.*)

Plaintiff acknowledges that cell houses, except F-House, had exhaust fans, but contends that there was no ventilation. (Dkt. 125 at ¶ 26.) He also contends that repairs to fans or ventilation issues were not made as regularly as indicated by Warden Hardy. (*Id.*) Citing a list of 301 work orders submitted in 2011 for a variety of maintenance issues, Plaintiff contends that maintenance workers could not keep up with the conditions that needed repairs. (*Id.*, citing Exhs. M and N.) The list of work orders, however, contains very few requests for repairs to exhaust fans or other ventilation issues. (Dkt. 125, Exh. M) (most needed repairs were to the lack of hot or cold running water and for

TVs, toilets, and lights not working properly). Only two entries refer to needed repairs of blowers: the 12/12/10 entry states "heater blower not working," and the 1/15/11 entry states "repair blower switch." (*Id.*)

In addition to the list of work orders, Plaintiff submits three pages from an undated Safety and Sanitation report that details issues with several areas of the prison (general population's visiting room, protective custody's visiting room, towers #1-#17, the dining hall tower, and the gym tower). (Dkt. 125 at ¶ 26, citing Exh. N.) Similar to the list of work orders, among the many needed repairs, the Safety and Sanitation report mentions only once an issue with inadequate ventilation and air conditioning/heater not working properly in the gym tower. (*Id.*, Exh. N, pg. 36.)

**Mold:**

According to Warden Hardy, if he received complaints about mold, he would have directed maintenance personnel to address the issue. (Dkt. 119 at ¶ 32.) He further states he does not recall receiving complaints about mold between 2009 and 2012. (*Id.*)

Plaintiff points out that Warden Hardy was notified of the existence of mold from several sources: Plaintiff's 2/15/11 grievance and a Safety and Sanitation Inspection Report from June of 2010 noting the existence of mold in an administrative building, on walls in a bathroom in the business office, and in the health care unit. (Dkt. 125 at ¶ 33, citing Exhs. R, pgs. 52-54 and T, pgs. 57-59.)

Plaintiff states he saw black mold on shower walls, on walls above the school rooms, on walls above the bullpen, and in areas behind cells where pipes were located. (Dkt. 124 at ¶ 16.) He further states he saw prison staff "paint over black mold on the walls by the bullpen." (*id.* at ¶ 17.) Plaintiff acknowledges that he does not know if the mold about which he complains was ever tested to determine if it was toxic. (*Id.* at ¶ 15.)

**Availability of Cleaning Supplies:**

Warden Hardy states that when he was warden cleaning supplies were available to inmates upon request and also on a weekly basis by staff making rounds with supplies. (Dkt. 199 at ¶ 33.) Supplies included liquid soap, germ killers, and scouring powder. (*Id.*) Common areas were cleaned daily by inmate workers. (*d.*)

According to Plaintiff, he was not given cleaning supplies upon request or on a weekly basis. (Dkt. 124 at ¶ 18.) Plaintiff cites a July 13, 2011, Monitoring Report from the John Howard Association noting that several inmates complained about the lack of cleaning supplies and that Warden Hardy had stated that "staff members are sometimes lax in handing out these supplies." (Dkt. 125, Exh. U, pg. 60.) Nevertheless, Plaintiff acknowledges that he could buy two bars of soap on every commissary visit and that he could have used the soap to clean his cell. (Dkt. 129-2, Exh. B, Pl. Depo. 29-30.) He wanted to clean his cell daily given the birds and other pests he saw. (Dkt. 124 at ¶ 19.)

**Overcrowding and Lack of Exercise:**

Defendants contend that double celling inmates is not a constitutional violation and that Plaintiff's allegations stated no physical harm from an inability to exercise. (Dkt. 118, pg. 12.) Plaintiff states he always had a cellmate, there was not enough room in his cell to exercise, he was let out of his cell only twice a week for 2.5 hour periods (5 hours a week total), his back began to hurt, and he became depressed. (Dkt. 124 at ¶¶ 11, 12.) He contends that inmates were required to be let out of their cells for one hour each day. (*Id.* at ¶ 13.)

**Requests for Injunctive Relief:**

There is a pending class action suit in this Court about Stateville conditions. (*Id.* at ¶ 36) (citing *Dobbey v. Weilding*, No. 13 C 1068 (N.D. Ill.) (Dow, J.)). The class in that suit includes "all individuals incarcerated at the Stateville Correctional Center at any time since January 1, 2011." (*See* Dkt. 129, Exh. H, pg. 7 (copy of 2/11/14 Order from

*Dobbey v. Weilding*, No. 13 C 1068 (N.D. Ill.) (Dow, J.)). The living condition issues of that suit are the same as Plaintiff's. The *Dobbey* class does not include claims for money damages, but instead seeks only injunctive relief. (*Id.*)

## III. DISCUSSION

Defendants contend they are entitled to summary judgment because: (1) Plaintiff cannot prove they were personally involved with allowing the adverse conditions; (2) his living conditions were not objectively serious enough to support a constitutional claim; (3) he cannot establish Defendants acted with deliberate indifference to those conditions, (4) given the two-year statute of limitations applicable to § 1983 claims, this case cannot include claims about conditions that existed before July 31, 2010 (two years prior to the date Plaintiff filed this case), and (5) he cannot seek injunctive relief because of the class action suit.

### A. Defendants' Personal Involvement:

Defendants first argue that Plaintiff cannot establish they were personally involved with any of the adverse living conditions he alleges. They contend the summary judgment evidence shows that their only involvement was their denial of Plaintiff's grievances and review of his letters. Citing cases where review of a grievance alone was insufficient to establish liability for the condition described in the grievance, Defendants argue that there is no evidence of their personal involvement. Defendants' contention, however, is neither a correct application of the cases they cite nor an accurate description of the evidence.

"Section 1983 is premised on the wrongdoer's personal responsibility. Therefore, an individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012); *see also Grieueson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). Respondeat

superior—where a supervisor may be held vicariously liable for the tortuous acts of subordinates—does not exist in § 1983 actions, and "some causal connection or affirmative link between the action complained about and the official sued is necessary." *Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011) (the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye").

Furthermore, "[p]rison grievance procedures are not mandated by the First Amendment and do not by their very existence create interests protected by the Due Process Clause." *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) (citations omitted). The denial of a grievance "by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Id.* (citing *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007) ("A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not.").

Applying this principle, courts have found that, where the official has no control over the condition complained about—such as a warden reviewing a grievance about a medical condition for which the inmate is already under a doctor's care, or a governor receiving a letter from an inmate about adverse prison conditions—the official's review of a grievance or receipt of a letter, by itself, does not support the type of involvement needed for § 1983 liability. If there is "no personal involvement by the warden [in an inmate's medical care] outside the grievance process," that is insufficient to establish personal involvement. *Neely v. Randle*, No. 12 C 2231, 2013 WL 3321451, at *3 (N.D. Ill. June 29, 2013) (Kennelly, J.) (quoting *Gevas v. Mitchell*, 492 Fed. Appx. 654, 660 (7th Cir. 2012)).

But "ignoring or failing to conduct an investigation of an inmate's grievance" can demonstrate the requisite personal involvement. *Hoddenback v. Chandler,* No. 11 C 50348, 2013 WL 5785598, at *3 (N.D. Ill. Oct. 28, 2013) (Reinhard, J.) (citing *Santiago v. Walls*, 599 F.3d 749, 758–59 (7th Cir. 2010)). Letters to prison administrators can establish the requisite involvement where "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (citing *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996); *see also Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1015 n.3 (N.D. Ill. 2015) (citing cases).

In the instant case, Plaintiff's amended complaint asserts he notified each of the Defendant officials (then Counselor John Baldwin, Warden Hardy, IDOC Director Godinez, Acting Director Taylor, Grievance Officer Franklin) through grievances, letters, and personal conversations about the adverse living conditions. (Dkt. 16, Amended Compl. at pgs. 4-47.) Plaintiff also testified about how each Defendant was informed of Stateville's living conditions but took insufficient steps to address them, including then-Chief Engineer Luschinger, who allegedly made inadequate repairs to several conditions. (Dkt. 129, Exh. C, Pl. Dep., pgs. 11-31.) Additionally, the copies of grievances, letters, memos, and reports replete in the record provide enough evidence to create a disputed issue of fact about each Defendant's knowledge of and involvement in the allegedly unconstitutional living conditions at Stateville. Summary judgment cannot be granted based on Defendants' contention that no reasonable jury could find they were personally involved in Plaintiff's adverse living conditions.

**B.      Deliberate Indifference to Adverse Living Conditions:**

To establish a constitutional violation with respect to prison living conditions, an inmate must be able to demonstrate both: (1) the conditions were so adverse that they deprived him "of the minimal civilized measure of life's necessities" (the claim's objective prong) and (2) the defendant acted with deliberate indifference with respect to the conditions (the claim's subjective prong). *Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 832, 834 (1994)).

As to the objective prong, "[t]he Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996).   The necessities of life include "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Gray* , 826 F.3d at 1005 (quoting *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987)).  Although "extreme deprivations are required," *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001), and "routine discomfort[s]" do not suffice, *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), "[s]ome conditions . . . may establish an Eighth Amendment violation in combination when each alone would not do so," and other conditions that may not be sufficiently serious for a short period of time, "can become an Eighth Amendment violation . . . if endured over a significant time." *Gray*, 826 F.3d at 1005 (citations omitted).

"Deliberate indifference . . . means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend*, 522 F.3d at 773.  Establishing that an official acted negligently does not suffice.  "Instead, the inmate must show that the official received

information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference." *Id.*

**1. Plaintiff's Access to Drinkable Water:**

The evidence in the record shows the following. Plaintiff complained that water from his sink was brown and had a foul smell. He became ill several times when he drank it. He received milk and juice with breakfast, but his acid-reflux condition prevents him from drinking juice. Plaintiff believed the water was contaminated and points to a 2003 report indicating that radium levels were above acceptable EPA standards. Counselor Baldwin, in response to Plaintiff's grievances, stated: Plaintiff did not have to drink water from his sink; soda and water were available for purchase at the commissary; the City of Crest Hill supplied the water for Stateville, which was tested monthly; and those test results showed that contaminants were within normal limits. Warden Hardy states that he personally, drank the water every day and neither he nor any employee, as far as he knows, became ill from it.

"Drinking water . . . 'is, undoubtedly, a necessity of life.'" *Williams v. Collins*, No. 14 C 5275, 2015 WL 4572311 at *3 (N.D. Ill. July 29, 2015) (quoting *Dillard v. Washington*, No. 96 C 698, 1998 WL 142360 at *3 (N.D. Ill. March 20, 1998). However, "[t]here is no constitutional right to running water in a prison cell." *Downs v. Carter*, No. 13 C 3998, 2016 WL 1660491 at *8 (N.D. Ill. Apr. 27, 2016) (citing *Scruggs v. SinClair*, No. 3:16-CV-039 JD, 2016 WL 344534 at *2 (N.D. Ind. Jan. 27, 2016)). "[A] lack of running water in an inmate's cell is not a constitutional violation where the inmate has access to drinking water in other prison areas." *Downs*, 2016 WL 1660491 at *8 (quoting *Scruggs*, 2016 WL 344534 at *2); *Williams v. Collins*, No. 14 C 5275, 2015 WL 4572311

at *3 (N.D. Ill. July 29, 2015). "Generally, a week in a cell with broken plumbing is 'an inconvenience,' not a constitutional violation, if the inmate receives three meals a day, each of which is accompanied by beverages." *Downs*, 2016 WL 1660491 at *8 (quoting *Muhammad v. Wilson*, No. 05 C 743, 2006 WL 2413710 at *2-3 (N.D. Ill. Aug.16, 2006)); *see also Mims v. Hardy*, No. 11 C 6794, 2013 WL 2451149 at *9 (N.D. Ill. June 5, 2013) (holding that an inmate's "lack of access to drinking water from the sink in his cell" did not violate the Eighth Amendment because he could "fill his water bottle using a hose," "purchase beverages from the prison commissary," and received "water or some form of beverage three times a day"). Nevertheless, even where an inmate receives water or something to drink with meals, other factors must be considered. *Downs*, 2016 WL 1660491 at *8 (although inmate received water with meals, the summary judgment evidence indicated that the heat index during the relevant time period was as high as 110 degrees Fahrenheit, thus requiring additional fluids).

With respect to Plaintiff's claim that the water supply overall at Stateville was contaminated and undrinkable, summary judgment is warranted. Although there may have been an issue with radium levels in Stateville water in 2003 (Dkt. 125, Exh. I), more recent testing of Stateville's water, which comes from the neighboring town of Crest Hill, show contaminants within acceptable EPA levels. (Dkt. 129, Exh. F.); *see also Riley El v. Godinez*, No. 13 C 5768, 2016 WL 4505038 at *7 (N.D. Ill. Aug. 29, 2016) (addressing a similar claim of contaminated water at Stateville over the same time-period as Plaintiff's and considering the same test results, another member of this Court concluded that "the evidence shows no systemic contamination of Stateville's water above acceptable EPA levels"). Given the evidence that Stateville's water contained no

contaminants above acceptable EPA levels and that Stateville used the same water as its neighboring city Crest Hill, Plaintiff cannot establish a constitutional violation with the prison's water overall. "The Eighth Amendment does not entitle Plaintiff to 'cleaner water' than he would enjoy outside of prison, nor require prison authorities to take remedial action not otherwise mandated by authorities like the EPA." *Riley El*, 2016 WL 4505038,at *8 (quoting *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001)).

The fact that Stateville's water in general was not contaminated, however, does not address the essence of Plaintiff's undrinkable water claim. His main contention is that the water from the sink in his cell was brown, had a foul smell of either sewerage or bleach, and made him ill. As noted above, the Constitution does not mandate that inmates have clean running water in the sinks of their cells, but it does mandate that inmates have adequate fluids to drink.

The record is not sufficiently developed with respect to whether Plaintiff had adequate drinking fluids. The Court first notes that Plaintiff was housed in at least two different cells during the relevant time-period of his claims. Most of the time, he was in D House in general population. (Dkt. 129-2, Exh. B, pg. 13-14.) For 90 days (it is unclear when), he was housed in segregation in F-House. (*Id.* at 23.) While in segregation, he received milk and juice with breakfast; "[a]t lunch and dinner, [he go]t nothing." (*Id.* at 26-28) When Plaintiff was in general population, he received breakfast in his cell. The other two meals were in the chow hall. (*Id.* at 33-34.) The grievances complaining about brown, foul smelling, undrinkable water in his cell appear to concern his general population cell. (*See* Dkt. 16, pgs. 31-39; Dkt. 125, pgs. 21, 27-29) (all the grievances about water from Plaintiff's sink being brown and smelling foul were about

cell D340 in general population).  Although Plaintiff, while in general population, had

two of his meals in Stateville's dining hall, the record does not indicate if Plaintiff

received something to drink with these meals.  He likely did, but the Court cannot

conclude this based on this record.  Regardless whether he had fluids with his dining hall

meals, the record indicates that, for 90 days in segregation, he received only milk and

juice with breakfast, but nothing to drink with his other two meals.  Whether his sink in

segregation had drinkable water and whether Plaintiff's complaints concerned only cell

D340 is unclear.  Given the Court's inability to make these determinations, summary

judgment for this claim is denied.

**2. Pest Infestations:**

"[A] prolonged pest infestation, specifically a significant infestation of

cockroaches and mice," may be sufficiently adverse to support the objective element of a

deliberate indifference claim.  *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008); *Gray*,

826 F.3d at 1008 ("Depending on how extensive the infestation of a prisoner's cell is,

what the infesting pests are, what odors or bites or risk of disease they create, what

particular psychological sensitivities the prisoner was known to have . . .  and how long

the infestation continues, a trier of fact might reasonably conclude that the prisoner had

been subjected to harm sufficient to support a claim of cruel and unusual punishment.")

(quoting *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012)).  The parties do not

dispute that there was a pest infestation problem at Stateville.  According to Plaintiff, he

had "roaches, ants, mice in [his] cell" and "[b]irds would fly thr[ough]out cell houses like

they were outside[, and] there was bird poop on the walls, the exhaust fans, and blowers."

(Dkt. 124, Pl. Decl. at ¶¶ 14, 15.)  Defendants instead contend that sprayings by

exterminators and Warden Hardy's continued efforts—his directives for monthly sprayings inside cells, for cell-house officials to convey inmate complaints to exterminators, for placement of screens on outside doors to prevent bird infestations, for power washings in response to complaints of bird feces—demonstrate the lack of deliberate indifference.

Contrary to Defendants' contention, the record does not support summary judgment on the subjective prong of Plaintiff's deliberate indifference claim. Apart from Warden Hardy's declaration, the record indicates no increased efforts to address the pest infestation problem. A 2011 John Howard Association Monitoring Report states there were still inmate complaints of pests. IDOC Safety and Sanitation Reports from 2009-12 indicate that cell houses continued to have insects, birds, and rodents and, as noted above, Plaintiff's declaration states the pest problem persisted. Also, and perhaps most notable, Stateville's sign-in sheets for Critter Ridder show that, although it visited each cell house once a month, it went inside individual cells only twice between 2010-12. (Dkt. 129-5, Exh. E.) Summary judgment cannot be granted on this issue.

**3. Ventilation, Mold, Cleaning supplies, Overcrowding, Exercise:**

As to Plaintiff's other adverse conditions—inadequate ventilation, inadequate access to cleaning supplies, excessive mold, overcrowding, and an inability to exercise regularly—the summary judgment evidence consists of disputed issues of fact as to both the severity of the conditions and Defendants' response to them. Both Plaintiff and Defendants submit declarations and reports about these conditions. Although the summary judgment evidence may indicate that some of the conditions were not that adverse, "[s]ome conditions . . . may establish an Eighth Amendment violation in combination when each alone would not do so" and other conditions that may not be

sufficiently serious for a short period of time, "can become an Eighth Amendment violation . . . if endured over a significant time." *Gray*, 826 F.3d at 1005.

Disputed issues of material facts also exist with respect to the second prong of Plaintiff's deliberate indifference claims—whether Defendants were aware of the adverse conditions but intentionally took inadequate steps to address them. According to Defendants, "when issues regarding conditions at Stateville were brought to their attention, [Warden] Hardy took steps to correct the problem[ and] . . .. Defendants did not ignore conditions issues but were diligent in their efforts to address problems brought to their attention." (Dkt. 118, pg. 13.) According to Plaintiff: "I wrote grievances . . . and wanted the prison officials to look into my claims [and] fix these issues, but the issues were not fixed and I continued to be subjected to these conditions [and] suffered as a result." (Dkt. 124, Pl. Decl. ¶ 20.) The Court cannot conclude that the undisputed evidence demonstrates a lack of deliberate indifference, and summary judgment is denied with respect to these claims.[5]

## C. Timeliness of Plaintiff's Claims:

Noting that Plaintiff filed this suit in July of 2012 and that the limitations period for § 1983 claims in Illinois is two years, Defendants contend that all claims concerning conditions prior to July of 2010 are time-barred. (Dkt. 118, pg. 7) (citing *Ray v. Maher*, 662 F.3d 770, 773 (7th Cir. 2011) (citing 735 ILCS 5/13-202). Defendants are correct that Illinois' two-year limitations period applies to Plaintiff's claims. However, the imitations period for a prisoner's § 1983 action is tolled "while a prisoner completes the administrative grievance process." *Johnson v. Rivera*, 272 F.3d 519, 522 (7th Cir. 2001);

---

[5] Defendants argue that Plaintiff's claim about toxic lead-based paint should be dismissed along with his claims about other adverse conditions. This Court, however, dismissed this claim in its 5/15/14 order. (Dkt. 51). Plaintiff has not sought to reinstate it. The claim thus remains dismissed.

42 U.S.C. § 1997e(a). Plaintiff "could not bring suit until he exhausted the prison grievance process." *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017). The current record contains grievances filed by Plaintiff filed between November of 2010 and July of 2011, which would have tolled the limitations period. (Dkt. 16, Exhs. E-J; 125, Exhs. E, K, R.) The record is undeveloped as to whether Plaintiff filed grievances prior to July of 2010 that would have further tolled the limitations period for some or all of his claims. Given Plaintiff's litigious nature (he has filed 12 suits in this Court, as well as 5 appeals), it is very possible he filed additional grievances. Defendants have not met their burden of demonstrating that there is no disputed issue of material facts as to the beginning and end of the limitations period for Plaintiff's claims. *Carroll*, 698 F.3d at 564. Before Defendants seek to establish how far back Plaintiff's claims may extend, they must provide additional evidence, as well as address whether Plaintiff's claims involve continuing violations. *See Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001).

### D. Injunctive Relief:

Defendants correctly note that Plaintiff is a member of the class certified for injunctive relief in *Dobbey v. Weilding*, No. 13 C 1068 (N.D. Ill.) (Dow, J.) (Order of 2/11/14 certifies a class for "all individuals incarcerated at the Stateville Correctional Center at any time since January 1, 2011," and notes that the suit is for injunctive relief to address the myriad of adverse conditions listed in the order). Since the class was certified for injunctive relief, Plaintiff cannot opt out of it. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011) (addressing the differences between a class action for monetary relief under Fed. R. Civ. P. 23(b)(1) and for injunctive relief under Rule 23(b)(2)). Plaintiff cannot proceed with requests for injunctive relief in both cases. *Serlin v. Arthur*

*Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993). The Court also notes that, since Plaintiff is no longer at Stateville, any request for injunctive relief is moot. *See Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012) (noting that a plaintiff's release from incarceration rendered moot his claim to allow him to wear dreadlocks in prison).

## **CONCLUSION**

Defendants' motion for summary judgment [117] is granted in part and denied in part. Plaintiff's claims asserting that the water at Stateville in general was contaminated with radium and/or similar contaminants and seeking injunctive relief are dismissed. Plaintiff may proceed with his other clams, including his claim that the water from the sink in his cell was undrinkable. A status hearing is set for June 27, 2017 at 9:00 a.m. Defendants' counsel shall make arrangements for Plaintiff's participation.

_____
**Thomas M. Durkin**
**United States District Judge**

**DATE: 6/12/2017**